Argued April 22, reversed and remanded October 7, 1959
# LEFLER $v.$ LEFLER
344 P. 2d 754

*J. William Stortz,* Salem, argued the cause and filed the brief for the appellant.

*C. L. Marsters,* Deputy District Attorney, Salem, argued the cause for the respondent. With him on the brief was Hattie J. Bratzel, District Attorney, Salem.

Before ROSSMAN, J., presiding, and PERRY, SLOAN and CRAWFORD, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from an order of the circuit court which sustained the defendant's demurrer to the complaint and dismissed the proceeding.

The complaint, which is entitled petition, avers: plaintiff and defendant were married November 2, 1946, and divorced January 21, 1955; they are the parents of three children ranging in age from four to ten years; the decree of divorce was granted by the District Court of Kansas to the defendant together with the custody of the three children; the decree directed the plaintiff to pay for the support of the children $90 per month; the plaintiff has not paid the entire sum of support money; the children reside with their mother

(defendant in this proceeding) in Kansas; November 1957 the plaintiff became a resident of Oregon and recently was charged by the state of Kansas with the crime of failing to support his children; a fugitive warrant has been served upon the plaintiff and extradition has been allowed by the Governor of Oregon; the children are entitled to support from plaintiff and he earns $50 per week. The concluding paragraph of the complaint states that the plaintiff:

> "* * * voluntarily submit[s] himself to the jurisdiction of the above-entitled Court in accordance with said Uniform Reciprocal Enforcement of Support Act of this State and the State of Kansas to the end that this Court shall make and enter an order herein requiring the petitioner to pay a sum certain herein for the support and maintenance of said minor children * * *."

The prayer of the complaint petitions the court to enter an order of support against the plaintiff in favor of his three minor children.

The district attorney for Marion County, on behalf of the defendant (former wife), filed a demurrer which charged "the Court has no jurisdiction of the person of the respondent, or the subject of the action." When the demurrer was sustained and the proceeding was dismissed the plaintiff appealed.

This proceeding was instituted under the Uniform Reciprocal Enforcement of Support Act, 9C ULA, page 12, which became a part of our laws through Oregon Laws 1953, chapter 427. It is now ORS 110.005 through 110.291. Kansas adopted the same measure: Kansas General Statutes, 1955 Suppl 23-419 through 23-446. The act was originally written by the Commissioners on Uniform State Laws in 1950 and was given its present form in 1952. It refers to the party

who owes a duty to support as an obligor, and to the party to whom the duty is owed as an obligee; we will use the same terms. Briefly stated, the act provides for relaxed rules of extradition and for a two-state proceeding to determine the amount of support money which a deserting obligor must pay.

The purposes of the act are stated in ORS 110.011 as follows:

> "The purposes of this chapter are to improve and extend by reciprocal legislation the enforcement of duties of support and to make uniform the law with respect thereto."

*Keene v. Toth,* 335 Mass 591, 141 NE2d 509, expressed the purpose of the act in this way:

> "* * * Its purpose is to provide an effective procedure to compel performance by a person who is under a duty to support dependents in another State. * * *"

The uniform act is divided into three divisions: (a) general provisions, (b) criminal enforcement provisions and (c) civil enforcement provisions. The act is preceded in 9C ULA, page 3, by a prefatory note which alludes to the problem which the "increasing mobility of the American population" creates for those who depend for support upon a run-away bread winner who has foresaken his obligees. It also mentions the perplexities which that situation creates for the public officers who seek to enforce the payment of support money. Since the note is concerned with the plight of an obligee, such as a mother who is abandoned by an obligor who has gone to another state, it accepts as its theme "the problem of interstate enforcement of the duties of support." Although the plight of a mother who, unassisted by a father who has gone hence, seeks to provide the children with a home and

subsistence is heart rending, the act recognizes that domestic discord can not generally be reconciled by the administration of punishment. Accordingly, it makes provision so that cases of nonsupport in which obligee and obligor live in different states may be approached by not less than two means, that is, civil and criminal. The question is, does it authorize approach to the problem by a combination of the two.

We mentioned that the act is divided into three divisions, general, civil and criminal. The general provisions include this: (9C ULA, § 3; ORS 110.031)

"The remedies herein provided are in addition to and not in substitution for any other remedies."

The civil enforcement provisions create and authorize the use of a two-state proceeding to enforce the payment of support money which the authors of the measure believed would enable the obligee to enforce payment of support money inexpensively. The proceeding is calculated to render it unnecessary for the obligee to incur the expense of traveling to the state where the obligor resides in order to give testimony. The prefatory note from which we have quoted says:

"* * * In the past, the greatest difficulty in enforcing support where the parties are in different states has been the expense of travel to a distant state to litigate the rights of the destitute obligee. Under this Act this expense can be reduced to filing fees plus a few postage stamps. * * *"

The prefatory note describes the two-state proceeding in this manner:

"* * * It opens with an action (Section 9) which normally will be commenced in the state where the family has been deserted (the initiating

state). A very simplified petition is filed (Section 10). The judge looks it over to decide whether the facts show the existence of a duty of support and if they do he sends the petition and a copy of this Act to a court of the responding state to which the husband has fled or in which he has property (Section 13). That court will take the steps necessary to obtain jurisdiction of the husband or his property, will hold a hearing (Section 17) and if the court finds that a duty of support exists, it may order the defendant to furnish support * * *."

*Sinclair v. Sinclair*, 196 Tenn 538, 268 SW2d 573, portrays in the following passage the actual conduct of a two-state proceeding:

"* * * In the instant case the proceeding was instituted in Alabama, the initiating State, and then sent to Tennessee where service process was had on the defendant, the defendant answered and offered proof in support of his answer. The trial judge in Tennessee on this proof and petition determined that this minor child was entitled to support and that the payments decreed by the Alabama Court were reasonable under the circumstances, from the proof and facts that he had heard in Tennessee. It thus clearly appears that due process is preserved and that the defendant in Tennessee had his day in court and the judgment only was rendered against him after he had an opportunity to offer proof. It is on this proof that the Tennessee court has decreed that the support is due and is reasonable under the circumstances, that is, from the proof heard in the Tennessee court."

The proceeding at bar did not have its origin in the foregoing civil provisions of the act. Its inception occurred when the plaintiff was indicted in Kansas and the governor of that state sent a requisition to this state for his extradition. Although the civil proceedings above reviewed are not directly concerned with

this case, we believe that they cast light upon the purpose and thereby the meaning of the entire act.

The criminal enforcement provisions of the act are only two in number. One of them is section 5 (ORS 110.051). The other is section 6 (ORS 110.061). The latter, if its phraseology is given its normal effect, concludes in the entry of an "order of support." Such an order obviously has its civil connotations although its entry, followed by the obligor's compliance with its demands, results in his release from incarceration.

Before we quote ORS 110.051 and 110.061 we will notice the part of the prefatory note previously mentioned which pertains to those two sections of the law. The part which refers to section 5 (ORS 110.051) reads:

"* * * Charges could be preferred against the fleeing husband but he had to be returned for trial to the state where the offense was committed. Extradition was both expensive and narrowly technical, and it was often impossible to prove that he had 'fled from justice' for frequently he supported his family until he left the state and only left in order to get a job. Even if he were brought back and successfully prosecuted the result was disappointing. The proceedings rendered reconciliation with the family improbable, took him away from his job in the state to which he had fled, and by branding him a convicted criminal lessened the probabilities of gainful employment in the home state."

Concerning section 6, which is ORS 110.061, the prefatory note says:

"Section 6 provides necessary relief from extradition if the obligor complies with support orders of the state. This is designed to encourage voluntary compliance which will be much more profitable to both states than the expensive procedure of extradition."

Section 5 of the act (ORS 110.051) reads:

"The Governor of this state (1) may demand from the Governor of any other state the surrender of any person found in such other state who is charged in this state with the crime of failing to provide for the support of any person in this state and (2) may surrender on demand by the Governor of any other state any person found in this state who is charged in such other state with the crime of failing to provide for the support of a person in such other state. The provisions for extradition of criminals not inconsistent herewith shall apply to any such demand although the person whose surrender is demanded was not in the demanding state at the time of the commission of the crime and although he had not fled therefrom. Neither the demand, the oath nor any proceedings for extradition pursuant to this section need state or show that the person whose surrender is demanded has fled from justice, or at the time of the commission of the crime was in the demanding or other state."

The following is section 6 (ORS 110.061):

"Any obligor contemplated by ORS 110.051, who submits to the jurisdiction of the court of such other state and complies with the court's order of support, shall be relieved of extradition for desertion or nonsupport entered in the courts of this state during the period of such compliance."

■ The issue presented by this case is whether ORS 110.061, just quoted, and its companion section in Kansas (Kansas General Statutes, 1955 Suppl, § 23-424) authorize a person, such as this plaintiff whose extradition has been ordered by the governor of Oregon, to submit himself to the Oregon courts and then (1) petition the Oregon courts to determine the amount which he should pay for the support of his obligees and (2) upon paying the amount thus determined become relieved from extradition. If such a course is

possible, the civil and criminal phases of the act would, to that extent, cooperate in the production of the release order. It will be recalled that ORS 110.061 says that the obligor "shall be relieved of extradition * * * during the period of such compliance." If ORS 110.061 authorizes the course just outlined, it must, of course, be given effect. If that course is taken, the criminal laws of Kansas pertaining to nonsupport will not be defeated. The indictment which is pending in that state against this plaintiff will remain. The effect of the release of the accused would merely withhold his extradition so long as he complied with the order of support. The withholding of extradition in that event would be authorized by a statute adopted not only in the state where extradition was withheld but also by a corresponding statute adopted in the state which sought extradition.

It will be noticed that ORS 110.061 speaks of "any obligor * * * who submits to the jurisdiction of the court of such other state." The question at once occurs as to which of the two states—Kansas or Oregon—is meant by the words "such other state." It is necessary to determine that question because "the court of such other state" is empowered by this statute to enter an "order of support" which, upon meeting with compliance, entitles the obligor to "be relieved of extradition." Accordingly, in the case at bar, if Oregon, being the asylum state, is "such other state" then it would seem that the Oregon courts may enter an "order of support" of the kind that the plaintiff (the obligor) requests. It will be recalled that ORS 110.061 states that an order of that kind when made and complied with entitles the obligor to be "relieved of extradition." Accordingly, we will proceed to determine whether Oregon, being the state in which the obligor

took asylum, is "such other state." ORS 110.061, in employing the term "such other state," says:

> "Any obligor contemplated by ORS 110.051, who submits to the jurisdiction of the court of such other state * * *."

That provision indicates that we must look to ORS 110.051 for identification of the state to which the words "such other state" refer.

ORS 110.051 approaches the problem from the standpoint of a requisition presented by this state, that is, by Oregon. For example, it says:

> "The Governor of this state (1) may demand from the Governor of any other state the surrender of any person found in any such other state who is charged in this state with the crime of failing to provide for the support of any person in this state * * *."

That provision renders it clear that the term "this state" means the state which seeks the return of the individual who is charged with the crime of failure to support and that the terms "any other state" and "such other state" mean the state in which the accused person has taken asylum and which is asked to surrender him. Stated otherwise, "such other state" is the asylum state to which the writ of extradition is directed. It is the state which is authorized to enter the order of support. In the present case Kansas is the state which wishes the surrender of the plaintiff and Oregon is the state in which the plaintiff was living when he was apprehended. Oregon is, therefore, "such other state."

Returning again to ORS 110.061 and bearing in mind the meaning of the two terms of which we have just taken notice, it will be observed that ORS 110.061

says that any obligor who is apprehended in a state in which he has taken asylum and who becomes the subject of extradition proceedings may take the following course: (1) submit to the jurisdiction of the court in which he is held under extradition warrant, (2) secure from the court of that state an "order of support" and (3) upon complying with the order "be relieved of extradition * * * during the period of such compliance."

Before coming to a final conclusion upon the issues just analyzed we will take note of a further matter. Although the issues before us as to whether the plaintiff may submit himself to the jurisdiction of the Oregon courts and obtain an order of support which, if he complies with it, will entitle him to his release must be resolved by the terms of ORS 110.061, nonetheless, an inkling as to the meaning of that section of our laws may possibly be gained from the experiences undergone by nonsupport cases in criminal and extradition proceedings. We take the following from the chapter entitled "Reciprocal Support Legislation" by von Otterstedt in Current Trends in State Legislation, 1952, page 165:

"Finally, it is very questionable whether the criminal remedy and extradition proceedings serve a useful purpose at all; of late, lawyers as well as sociologists have come to recognize that the problem of family desertion cannot be solved by enactment of criminal desertion statutes because desertion and nonsupport of family is merely a symptom of a more deeprooted social problem which can only be solved by a sane educational approach before the family bonds have been broken. Criminal prosecution attaches the stigma of social outcast to the breadwinner; a prison sentence further aggravates already existing mutual grievances which the spouses harbor for each other, and reconciliation becomes practically impossible. The family is pri-

marily interested in being supported and criminal prosecution as well as subsequent extradition will not help the family to regain its balance, either financially or psychologically. Certainly, it would be preferable to devise some solution which would make it possible for the breadwinner to retain his employment wherever found, and exert legal compulsion, forcing him by court action in the state where he has found gainful employment to contribute a certain share of his earnings to the support of his family. Nonetheless, the statutory trend seems to be rather in the direction of more and better criminal nonsupport legislation as evidenced by recent enactments. Moreover, there is a determined movement afoot to implement state statutes and the effective enforcement of criminal desertion laws by federal legislation which would make it a federal offense to cross state lines with an intent to avoid support obligations. There is substantial merit to the argument that the efficiency of criminal desertion statutes should not be underestimated; on an intra-state level, the threat of criminal prosecution for nonsupport has proved itself to be an effective deterrent to the would-be deserter. Until some means are found to prevent family desertion by going to the source of the family disintegration, the undesirable results of nonsupport and abandonment will have to be controlled by legislation."

Similar sentiments were expressed in 37 American Bar Association Journal 93 by W. J. Brockelbank, chairman of the committee of the National Conference of Commissioners on Uniform State Laws which drafted the act. His treatise stated:

"* * * When the husband-father is taken to the state which he left, there can be little hope of a reconciliation with the wife who has had to act as informer against him. He must stand trial. If convicted, he may be fined or put in jail. Having lost his job there is little likelihood of his being able to pay a fine large enough to be of real help

if turned over to his family. So he goes to jail and a pittance of one or two dollars a day taken from his earnings on the rock pile is all that his family will receive. If put on probation, many husbands simply sit down and refuse to work. But if he is willing to work, he has other obstacles to overcome. He may have left the state in the first place after being fired by his employer or because his kind of work was not plentiful or was poorly paid. He is now back where he was before with the added difficulty that he is a 'convicted criminal' who has lost caste with his family and friends and reputation with potential employers. These disappointing results are all there is to show for the lengthy proceedings of extradition and trial in which numerous officials of two states have participated at great expense. To quote the Council of State Governments: 'The criminal process is impractical because of expensive extradition costs, the limited nature of the criminal statute, and the fact that the arrest of the husband or father destroys the source of wage earnings.' "

Those dissertations, which portray the unsatisfactory results that came from criminal prosecutions of neglectful obligors, indicate that the proponents of the uniform act must have viewed with hope and favor its provisions which authorize the accused to resume the support of his obligees. Accordingly, we must not find any of those provisions deficient or unworkable unless the defects are so deep rooted that other legislation already upon our books can not supply the needs.

Three courts have been confronted by the same issue which is before us: *In re Floyd*, 43 Cal2d 379, 273 P2d 820 (1954); *Sands v. Sands*, 60 Ohio Ops 181, 136 NE2d 747 (Ohio Common Pleas, 1956); and *Jackson v. Hall*, 97 So2d 1 (Florida 1957). Although the purpose of the act is to produce uniformity of law, the

Florida decision gave to section 6 of the act (ORS 110.061) a meaning directly opposed to the other two.

The Floyd case was governed by the act to which we have given attention. Floyd had been indicted in Ohio for nonsupport of a minor child and upon his apprehension in California sought his release from extradition by petitioning the California court to enter an order of support under section 6 of the act which we have identified for convenience purposes as ORS 110.061. The court held that section 6 conferred upon it no jurisdiction to enter the order. It stated:

"* * * But the act does not authorize such procedure. As 'obligor,' petitioner is the defendant in any support proceeding, and presumably the act used such term in the sense that such party does not initiate an action. The civil proceeding must be initiated by the plaintiff 'obligee,' and the defendant 'obligor' may submit to the court's jurisdiction in the process of defending the action commenced against him. * * *"

The court, in holding that section 6 did not confer authority upon the courts to enter upon an obligor's petition an order of support, described the language of that section as "sketchy, summary." It found that the section "merely declares the obligor's right to submit to the jurisdiction of the court in the responding state." According to the decision, section 6 "does not prescribe even the bare minimum of procedural steps to be taken in invoking such jurisdiction" and fails to outline a course whereby the courts of the asylum state would be apprised of the obligee's needs so as to make provision for them. The decision declared that if the court of the asylum state undertook to enter a support order it "would have only the obligor before it and would not know the conditions, circumstances or needs

of the obligee." Under those conditions the order of support entered in the asylum state would, so the court reasoned, enable the obligor to obtain immunity from extradition cheaply. The court's words were, "Such immunity might be bought cheaply." The decision did not go unchallenged. Justice Schauer, in dissenting, stated:

> "* * * The real question in this case appears to be whether to accomplish the practical result of obtaining the funds for support of the allegedly needy obligee, or to instead emphasize the penal aspects of the matter by supporting extradition of the obligor for the purpose of imprisonment. I believe it is better public policy to construe the statute to secure the financial relief for the dependent obligee by leaving the obligor in the position where he is receiving pay which can be made available to that end."

Justice Schauer's dissenting opinion depended upon section 6 of the act and declared that the other part of the act which outlines the two-state civil proceeding instituted by an obligee "appears to be adaptable to the proceedings here instituted by petitioner." He added that if it is not applicable,

> "* * * the courts are not powerless to devise a fair and appropriate procedure to be followed and one which would permit the evidence of the obligee (i.e., the obligee's conditions, circumstances, or needs) to be as fully presented to our courts as would be the case if the support proceedings are initiated in the obligee's home state and followed by supplemental proceedings in California."

He concluded by saying that an order for support money entered in the asylum state is "the more practical approach to actually attain the economic objective of laying hands upon the support funds. Surely that

objective is 'more likely to be achieved by permitting the obligor to remain in the state where he has become established and gains his livelihood than by the penal action of extradition for imprisonment."

The Sands decision was rendered by Judge Hoy alone of the court of common pleas. According to the plaintiff's (father's) petition, he was charged by Montgomery County, Kansas, with child desertion and was held in Ohio for return to Kansas. He prayed the Ohio court to enter an order of support. According to the decision:

> "There are no other pleadings in the case and no one is contesting plaintiff's action. Nevertheless, the Court has raised, sua sponte, the question of whether it has jurisdiction to entertain the action."

The judge did not have the benefit of either briefs or oral argument. The court cited and quoted from *In re Floyd*, supra, in holding that it lacked jurisdiction. It said:

> "* * * Thus the statute was not only not intended to prevent extradition but was actually designed to facilitate it."

The judge thought that if the statute were construed in accord with the plaintiff's views an absconding obligor could flee to another state, secure a support order there·"often based entirely on his own testimony" and remain there immune from extradition for nonsupport.

*Jackson v. Hall*, the Florida decision, after analyzing *Ex parte Floyd*, found itself unable to agree with the interpretation placed upon section 6 by that opinion. It will be recalled that the Floyd opinion held that section 6 does not authorize the obligor to institute

a proceeding for the entry of a support order—that only the obligee may do so. The Florida court said:

> "* * * we fail to see any valid reason for holding that the duty of support must be initially made to appear in a civil enforcement proceeding rather than in a criminal enforcement proceeding under the Act. Especially where, as here, the duty of support has been determined in a divorce decree specifically awarding support money for the minor child of the appellant, there would appear to be no danger that the obligor would escape extradition by making only 'token support payments,' a point which troubled the California court in Ex parte Floyd, supra."

The decision approved and quoted from the dissenting opinion of Justice Schauer. It ruled:

> "We have concluded that the provision of the Act in question means just what it says, that is, that a person who is about to be extradited under the provisions of Sec. 88.061 may relieve himself from such extradition by voluntarily submitting himself to a court of competent jurisdiction in the state of his residence and complying with such court's order as to the amount of support he should pay to the obligee. This interpretation is certainly the more practical approach to the problem of 'the enforcement of duties of support,' the avowed purpose of the Act. * * *"

The California and Florida decisions have been the subject of several law review articles. Most of the articles favor the Florida decision. One of them, 58 Columbia Law Review 421, in referring to the Florida decision, said:

> "The approach of the instant court seems correct. It is true that the act does not provide procedures for the presentation of evidence of the dependent's needs and circumstances when civil proceedings are commenced by the obligor in the

asylum state. But as indicated in the instant case, courts are not powerless to devise methods of obtaining the evidence necessary for the issuance of a fair decree. The prior contrary holdings would seem justified only if the statute were interpreted as allowing the obligee an election between civil and criminal remedies. It cannot be denied that where it is feared that the obligor will flee the responding state, the obligee's rights might be better safeguarded through extradition. However, in light of the disadvantages of extradition in matrimonial cases, the possibility of its misuse by vindictive obligees, and the act's primary purpose of providing support, such a reading of the act appears unwarranted. The instant decision, although reached at the expense of judicial uniformity, is reinforced by the practice of several states which require an exhaustion of civil remedies before extradition is utilized. * * *"

It will be noticed that the California and Ohio decisions held that section 6 of the uniform act does not confer jurisdiction upon a court to enter a support order upon the application of an obligor who is held for extradition. Those decisions expressed the view that the language of section 6 is inadequate to that purpose and that if the court in the asylum state undertook to enter a support order upon an obligor's petition it would lack information concerning the obligee's needs. The Ohio court especially seemed to be impressed with the desirability of rendering the obligor available to the criminal courts.

■ We do not believe that if a court accepts jurisdiction of an obligor's petition to enter a support order that it will lack the means of acquainting itself with the obligee's needs. We think that Justice Schauer's dissenting opinion correctly answers contentions of that kind. Moreover, wherever jurisdiction is con-

ferred upon a court for a prescribed purpose by a statute which does not delineate rules of procedure, the court is not helpless. It will pursue, under those circumstances, the course which the common law courts have taken from the earliest of times, that is, devise the needed procedure. No right is ever permitted to go unvindicated through lack of a procedural statute. ORS 1.160 says:

> "When jurisdiction is, by the constitution or by statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of jurisdiction, if the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes."

See also ORS 45.151. Obviously, if the court has jurisdiction to entertain the plaintiff's petition it should pursue the same procedure as if an obligee were availing herself of the two-state civil proceeding.

■ We do not believe that the imposition of punishment is the principal objective of the uniform act now before us. Some crimes such as larceny, assault and homicide call for punishment. By the time that the offender faces the court his crime has been completed and there remains nothing to be done except the imposition of a penalty unless an effort is to be made to rehabilitate the offender. But, nonsupport, especially if the obligee is a child of tender years, may continue into the future over a period of years. Punishment for what has taken place in the past may be minor as compared with the urgency of preventing further neglect. Moreover, the imposition of imprisonment will almost certainly render the restoration of family unity

impossible. Considerations of that kind caution us that imposition of punishment is not the principal objective of the act.

We think that section 6 (ORS 110.061) confers jurisdiction upon the Oregon courts to entertain a petition such as the plaintiff filed. We can conceive of no purpose which that section could serve except to authorize the Oregon courts to enter a support order upon the petition of the obligor and thereby facilitate the support of those whom he has so far neglected. Plainly, it would be much better if the obligor performed his duty without troubling the courts, but in instances of this kind the situation is not normal. It may be that the draftsman of the act, in recognition of the fact that families do not come to the critical juncture which is portrayed in the plaintiff's petition, in the absence of something abnormal, inserted in the act section 6 so that the obligor can be relieved from extradition if he wishes to stay where he has found employment and contribute to the support of his obligees a sum which the court rules is reasonable. We believe that an interpretation of the act to that effect is warranted and practical. The demurrer to the petition was erroneously sustained. The petition states a cause of action. The proceeding should not have been dismissed.

Reversed and remanded.